## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMY HARRIS ) | |
| 100 Industrial Drive ) | |
| P.O. Box #180 ) | |
| Lawrenceburg, IN 47025 ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. |
| U.S. HOUSE SELECT COMMITTEE ) | |
| TO INVESTIGATE THE JANUARY 6TH ) | |
| ATTACK ON THE UNITED STATES ) | |
| CAPITOL, and ) | |
| ) | |
| BENNIE G. THOMPSON, in his official ) | |
| capacity as Chairman of the U.S. House ) | |
| Select Committee to Investigate the ) | |
| January 6th Attack on the United States ) | |
| Capitol, ) | |
| ) | |
| *Defendants*. ) | |
| _____) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On November 24, 2021, the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "House Select Committee") issued and served an invasive and sweeping subpoena *duces tecum* that would compel a third-party telecommunications company to produce phone records reflecting privileged communications between a journalist and her confidential sources.

2.      Amy Harris is an experienced, freelance photojournalist.  Her work has been published in numerous reputable and well-known publications, including the *Washington Post*,

-1-

*Vanity Fair*, *Rolling Stone*, and *Time* magazine.[1] Ms. Harris licenses her photos through Shutterstock, a global photo agency, and also publishes her photos on her website, https://www.amyharrisphotos.com/.

3.      Ms. Harris' work in the past focused on photographing live music concerts and festivals.  At times, this would include pitching and developing profile stories of different bands and musicians.  When those venues were essentially shuttered during the COVID-19 pandemic in March 2020, she shifted her focus and began documenting the events of civil and political unrest unfolding across the country.  She began photographing the racial justice protests in the wake of George Floyd's murder on May 25, 2020, and later aimed her lens on a wholly different type of unrest leading up to and following the 2020 presidential election.  Beginning with the George Floyd and Black Lives Matter protests in May 2020, Ms. Harris traveled to 23 cities where protests occurred, took over 50,000 images, and had her work published by prominent news outlets.

4.      The subpoena instructs Verizon to produce, without limitation, *all* subscriber information and *all* call, text messaging, and other records of communications associated with Ms. Harris' phone number for a period of almost three months between November 1, 2020 and January 31, 2021. A redacted version of the subpoena and Verizon's letter to Ms. Harris advising her of the subpoena and the time to challenge it are attached hereto as Exhibit A.[2]

5.      During the time frame covered by the subpoena, Ms. Harris was actively engaged in a project documenting the far-right extremist group known as the "Proud Boys" and their leader, Henry "Enrique" Tarrio.  The Proud Boys notoriously came into national consciousness

---

[1] A complete list of the outlets that have published Harris' photographs is attached hereto as Exhibit B.
[2] For Ms. Harris' security, we have redacted her residential street address and telephone number.

following comments made by then-President Donald Trump during a September 2020 presidential debate.  In the course of chronicling the Proud Boys, Ms. Harris used her personal cell phone to communicate with confidential and nonconfidential sources in furtherance of that story and in support of other stories she was working on during the time period covered by the subpoena.

6.     Therefore, not only do the telephone records sought by the House Select Committee intrude on the personal and privileged communications of a private citizen, but they also seek information sufficient to reveal the identities of Harris' confidential sources and would impermissibly intrude on her protected newsgathering activities.

7.     The subpoena violates the core protections afforded to journalists pursuant to the First Amendment.  Furthermore, it seeks to undermine these fundamental protections without affording Harris fair notice and an opportunity to challenge its legality by demanding the records be turned over just two weeks after the subpoena was issued.

8.     The House Select Committee must be required to articulate in a court of law that it has exhausted all other sources of the information along with the reasons that the telephone records it seeks are so critical to its investigations that its discovery demands should be permitted to proceed unchecked in the face of these substantial constitutional concerns.

## PARTIES

9.     Plaintiff Amy Harris is a syndicated freelance photojournalist, engineer, and writer.  She resides in Lawrenceburg, Indiana.

10.     Defendant U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "House Select Committee") is a select committee established on June 30, 2021 by House Resolution 503 ("H. Res. 503").

11.     Defendant Bennie G. Thompson is a member of the U.S. House of Representatives and Chairman of the House Select Committee. Chairman Thompson signed the subpoena served on Verizon that seeks Plaintiff's subscriber information and records of communications associated with Plaintiff's phone number.  Chairman Thompson is sued in his official capacity.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and laws of the United States.

13.     This Court has authority to issue the requested injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 65.

14.     This Court has personal jurisdiction over the House Select Committee because it is located and operates in Washington, D.C.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant is a congressional committee of the United States that resides in this District, and a substantial part of the events giving rise to this action occurred in this District.

## NATURE OF THE ACTION

**A.     Ms. Harris' Long History as a Freelance Photojournalist**

16.     Amy Harris is a syndicated freelance photojournalist, engineer, and writer.  Her journalistic career began with shooting travel photography, and that work has been displayed in publications such as *National Geographic Books*, *Fodor's Travel Guides*, *Lonely Planet Travel Guides*, *JetStar magazine*, and *Delta Sky Magazine*.[3]

---

[3]  http://www.theveladdict.com/

17.     In 2008, she photographed her first band at Billboard Live Tokyo.  After that, she began covering live music festivals and concerts across the globe as a freelancer for *AP Images/Associated Press*, *City Beat Magazine*, and others.  Her music coverage can be seen in various publications and websites, including: *Rolling Stone*, *The New York Times*, *The Los Angeles Times*, *In Style*, *People*, *Total Guitar*, *Penthouse*, *New York Magazine*, *Glamour*, *Marie Claire*, *Music Radar*, *Ebony*, *Hip Hop Nation Magazine*, *Country Weekly*, and *Pollstar*.[4]

18.     Harris holds press credentials from the New York Police Department's Office of the Deputy Commissioner, Public Information ("DCPI"), as well as from the United States Press Agency. See Exhibit D.  Ms. Harris is also a member of National Press Photographers Association ("NPPA").  *Id.*

19.     Many of her photos are available for viewing and licensing on Shutterstock (https://www.rexfeatures.com/search/?kw=*ahs+protest&js-site-search_submit=Go&order=newest&iso=GBR&lkw=*ahs&viah=Y&stk=N&sft=&timer=N&req uester=&iprs=f).

20.     When the COVID-19 pandemic hit the U.S. in March 2020, live music concerts and festivals were essentially shuttered, and the ability to travel internationally was curtailed.

21.     Left without her typical subjects, Harris shifted focus and began documenting the racial justice protests and events of civil unrest occurring throughout the country in the wake of George Floyd's murder on May 25, 2020.

22.     She also began covering political rallies and protests leading up to and following the 2020 presidential election.  Many of the groups involved in those protests included far-right extremist groups such as the Proud Boys.

---

[4]http://www.apimages.com/Search?query=%22Amy+Harris%22&ss=10&st=kw&entitysearch= &toItem=15&orderBy=Newest&searchMediaType=excludecollections

23.     By the end of 2020, Harris had captured images of protests and protestors representing both ends of the political spectrum in 23 cities across the U.S., from Portland, Oregon, to Washington, D.C.[5]

24.     In or around the fall of 2020, and during the course of her photographing the protests and rallies, Harris crossed paths with Tarrio, a national leader of the far-right group the Proud Boys.  After consulting with her editor at her photo agency, Shutterstock, she pitched doing a "day-in-the-life type" profile on Tarrio and the Proud Boys.  Tarrio agreed to grant her access, and she began the project on December 7, 2020, in Miami.

25.     Upon information and belief, Harris's work documenting Tarrio throughout the remainder of 2020 earned her Tarrio's trust as a journalist and, accordingly, the trust of the members of his group, thus allowing her close access as she visually documented their activities with her photos.

**B.     Harris Photographed the January 6, 2021 Attack on the U.S. Capitol During the Course of Her Coverage of the Proud Boys**

26.     On January 4, 2021, Harris traveled to Washington, D.C. from Cincinnati as part of her coverage of Tarrio and the Proud Boys.

27.     Tarrio, who was traveling to Washington, D.C. from Florida, was arrested shortly after entering the District.  He was charged with one misdemeanor count of destruction of property in connection with the December 12, 2020 burning of a banner stolen from Asbury United Methodist Church, and two felony counts of possession of high-capacity ammunition feeding devices discovered after he was arrested and searched.

---

[5] Attached hereto as Exhibit C is a true and correct copy of an article published on January 7, 2021 in the *Cincinnati Enquirer* entitled "Cincinnati area photojournalist was at the U.S. Capitol Wednesday to capture the chaos."

28.     On January 5, 2021, Harris traveled to D.C. Superior Court and took photographs of Tarrio following his arraignment and release from jail.[6]

29.     On January 6, 2020, Harris was downtown to document the various "Stop the Steal" rallies and election certification protests as part of her story covering the Proud Boys. While there, she wore several forms of press identification.  *See* Exhibit D.

30.     Harris was already outside the U.S. Capitol, where Congress was gathered to formally affirm then-President-elect Biden's Electoral College victory, when she saw a crowd approaching the Capitol from the National Mall.

31.     The day after the attack, Harris told the *Cincinnati Enquirer* that she witnessed three men "'riling up the crowd'" and yelling "'Let's take it.  Let's take the Capitol.'"[7]  She said she was "'shocked'" as she witnessed people advancing toward the Capitol building and heard them calling for more people to come up.[8]

32.     At one point, she became separated from the Proud Boys group she was covering when she tripped and fell into a green mesh barricade that had already been torn down.[9]  When she fell, she lost her phone and feared she would be trampled by the crowd pushing toward the Capitol until someone helped her to her feet. She was pushed forward by the crowd and could not retreat for fear of being crushed.

33.     During the course of the attack, Harris shot photos from scaffolding set up for President Biden's inauguration and stayed near the lower tiers of the Capitol steps and the perimeter of the building.  Taking photos in the vicinity of some 10 other photojournalists, Harris

---

[6] A *Daily Mail* article includes Ms. Harris' photos, including one of the BLM banner being burned. https://www.dailymail.co.uk/news/article-9920081/Proud-Boys-leader-burned-BLM-flag-gets-5-months-jail.html.
[7] https://amp.cincinnati.com/amp/6584086002
[8] *Id.*
[9] *Id.*

heard people saying the Capitol had been breached.  She captured images of then-President-Trump's supporters clashing with police, scaling a concrete wall, and taking the Capitol's exterior.

34.    She continued to photograph the scene while remaining outside the Capitol building and left the Capitol area at around 5:45 p.m.

35.    Harris was without her phone the entire time she was documenting the attack on the Capitol.  She eventually discovered that her phone had been retrieved by one of the Proud Boys, who had left it for her to pick up at the desk of a Hyatt Hotel in D.C., which she eventually did later that evening.

36.    She does not know which member of the Proud Boys found her phone; when during the course of the attack her phone was found; or where else it may have been taken throughout the day.

37.    Harris did not have any expectation or knowledge prior to January 6, 2021, that a violent attack on the Capitol would occur.

38.    Harris's photographs from January 6, 2021 were licensed and published by several publications and websites, including the *Washington Post, Cincinnati Enquirer, Gothamist, Guardian*, and *Press and Journal*.

C.    **Authority and Activities of the House Select Committee**

39.    The House Select Committee was established June 30, 2021 by H. Res. 503, which sets forth the "purposes" of the House Select Committee.  They are:

a.    "To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex … and relating to the interference with the peaceful transfer of power";

b.  "To examine and evaluate evidence … regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and

c.  "To build upon the investigations of other entities … by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol."

40.    Additionally, H. Res. 503 establishes three "functions" of the House Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures …" https://www.congress.gov/bill/117th-congress/house-resolution/503.

41.    To accomplish its functions and purpose, H. Res. 503 gives the House Select Committee specified powers, including the authority to hold hearings, receive evidence, and issue subpoenas for information and depositions.

42.    Specifically, "[t]he chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of rule XI [of the Rules of the House of Representatives] in the investigation and study conducted pursuant to" the purposes and functions of the resolution; "[t]he chair of the Select Committee is authorized to compel by subpoena the furnishing of information by interrogatory"; and "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the

taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee …"

43.     Since its inception, the House Select Committee has issued a wide range of subpoenas, including numerous subpoenas seeking the production of documents and compelled testimony from individual witnesses.  *See, e.g.,* Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Demands Records Related to January 6th Attack from Social Media Companies* (Aug. 27, 2021). https://january6th.house.gov/news/press-releases/select-committee-demands-records-related-january-6th-attack-social-media-0.

44.     In the fall, the House Select Committee issued subpoenas to individuals with close ties to the former President and/or tied to efforts to overturn the 2020 election results, instructing them to produce materials and appear at depositions.  *See* Press Release, Bennie G. Thompson, Chairman, Select Comm. To Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Individuals Tied to the Former President in the Days Surrounding January 6th* (Sept. 23, 2021); Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Additional Witnesses Tied to Efforts to Overturn Election Results* (Nov. 8, 2021); Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Former Officials with Close Ties to the Former President* (Nov. 9, 2021). https://january6th.house.gov/news/press-releases.

45.     The House Select Committee has also issued several rounds of subpoenas for deposition testimony and records from individuals and groups tied to the events and

rallies leading up to the January 6th attack on the Capitol, and/or who helped or had knowledge of the planning and financing of the January 5th and 6th rallies in Washington, D.C.  *See* Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Organizers of Rallies and Events Preceding January 6th Insurrection* (Sept. 29, 2021); Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Individuals Involved in Planning and Organizing the Rallies and March Preceding January 6th Attack* (Nov. 22, 2021); Press Release, Bennie G. Thompson, Chairman, Select Comm. To Investigate the Jan. 6th Attack on the U.S. Capitol, *Select Committee Subpoenas Groups and Individuals Linked to Violent Attack on the Capitol on January 6th* (Nov. 23, 2021).

### D.  The House Select Committee's Subpoena to Verizon

47.    On December 2, 2021, Verizon Security Subpoena Compliance wrote to inform Ms. Harris that it had received a subpoena *duces tecum* requiring the production of certain records associated with her subscriber phone number.  She was provided a redacted copy of the subpoena, which was issued by the House Select Committee (the "Verizon Subpoena").[10]

48.    In that letter, Verizon advised Harris that unless Verizon received a court document challenging the Verizon Subpoena by December 15, 2021, it would be compelled to comply with its terms and turn over her records and information to the House Select Committee.

49.    The Verizon Subpoena seeks subscriber information and call detail records associated with Harris's phone number for the period November 1, 2020 to January 31, 2021.

---

[10] Verizon's December 2, 2021 letter to Harris forwarding the House Select Committee Subpoena to Ms. Harris is attached as Exhibit A.

50.     The Verizon Subpoena was issued on November 24, 2021 and requested that the information sought be produced just two weeks later, on December 8, 2021.

### D.     The Verizon Subpoena is Overly Broad and Exceeds the Purposes and Functions of the House Select Committee.

51.     The information sought by the Verizon Subpoena is expansive and invasive.

52.     Harris has a reasonable expectation of privacy in her personal cell phone data.

53.     Harris used her cell phone to conduct private and sometimes privileged conversations with friends and family between November 1, 2020 to January 31, 2021.

54.     She also used her cell phone to connect with journalistic sources, including confidential sources that were privileged, between November 1, 2020 to January 31, 2021.

55.     The subscriber information requested by the Verizon Subpoena demands subscriber names and contact information and cell phone data associated with Ms. Harris' personal cell phone number.  It encompasses "[a]ll call, message (SMS & MMS), Internet Protocol ("IP") and data-connection detail records associated with [Harris' phone number], including all phone numbers, IP addresses, or devices that communicated with [Harris' phone number] via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections."

56.     The private data requested by the Verizon Subpoena can be used to track *all* of Harris' personal communications for a period of more than two months prior to, and approximately one month after, the January 6, 2021 attack on the Capitol.

57.     Defendant Bennie Thompson, House Select Committee Chairman, criticized governmental investigations of journalists when a unit of Customs and Border Protection, conducted database searches on journalists' travel, searched for connections to the terrorism watchlist, and gathered other personal data. "'If true, this abuse of government surveillance

powers to target journalists, elected officials and their staff is deeply disturbing,' Thompson, the Democratic chairman of the House Homeland Security Committee, said in a statement. 'The United States government has an obligation to protect all citizens' right to privacy and freedom of speech. There must be accountability and protections in place to ensure that such incidents never occur.'" https://news.yahoo.com/deeply-disturbing-house-homeland-security-chair-on-report-of-cbp-investigating-journalists-and-elected-officials-223142505.html.

58.    The Verizon Subpoena is overly broad with respect to time frame, and contains no limitations seeking to preserve applicable privileges or prevent violations of Harris' constitutional rights, including her First Amendment rights as a journalist, her protection under the D.C. Shield law, and her Fourth Amendment right against unlawful search and seizure.

59.    It also exceeds the authorized purposes and functions of the House Select Committee pursuant to H. Res. 503.

**E.    Harris' Cell Phone Data is Protected by the Reporter's First Amendment Privilege, Federal Statutory and Common Law, and the District of Columbia's Press Shield Law.**

60.    The First Amendment of the United States Constitution and the reporter's privilege arising under federal common law protect against the compelled disclosure of information received by journalists in the course of their newsgathering activities and, particularly, the identity of confidential sources. These protections reflect a paramount public interest in the existence and maintenance of a vigorous, aggressive, and independent press capable of furthering a robust, unfettered debate over controversial matters and are based on the firm recognition that effective newsgathering depends significantly on journalists' ability to secure the confidence and trust of their sources.

61.     "The First Amendment guarantees a free press primarily because of the important role it can play as 'a vital source of public information.' . . . But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired.  Compelling a reporter to disclose the identity of a source may significantly interfere with [the press'] news gathering ability."  *Zerilli v. Smith*, 656 F.2d 705, 710-11 (D.C. Cir. 1981) (citations and footnotes omitted); *Lee v. Dep't of Justice*, 413 F.3d 53, 59-60 (D.C. Cir. 2005).

62.     The United States Department of Justice's Guidelines on gathering information from members of the news media explains that the "Department views the use of certain law enforcement tools, including subpoenas [and] search warrants to seek information from, or records of, non-consenting members of the news media as extraordinary measures, not standard investigatory practices."  28 C.F.R. § 50.10(a)(3).  The Guidelines specifically note that this policy applies to the use of subpoenas to "obtain from third parties 'communications records' or 'business records' of members of the news media. *Id.*, § 50.10(b)(2)(i).

63.     The Guidelines direct law enforcement authorities to use such tools only with authorization from the highest-ranking DOJ officials and when the information is "essential" and "after all reasonable alternative attempts have been made to obtain the information from alternative sources; and after negotiations with the affected member of the news media have been pursued and appropriate notice to the affected member of the news media has been provided." *Id*.

64.     In 2020, the Trump Administration's Justice Department "secretly sought reporters' phone and email records in an effort to identify the sources of leaks" and "has been under fire for its aggressive pursuit of leakers . . . after officials notified *The Washington Post*, CNN, and the *New York Times* that *prosecutors had secretly sought to obtain reporters' phone*

-14-

*and email records in 2020*. https://www.washingtonpost.com/national-security/adam-schiff-leak-investigation-eric-swalwell/2021/06/11/ee935590-ca58-11eb-81b1-34796c7393af_story.html. (emphasis added). In response to this revelation, "President Biden has vowed he would not allow the Justice Department to take reporters' records." *Id.* The Trump Administration Justice Department also "sought data on two lawmakers from California who were prominent critics of President Donald Trump — Rep. Adam B. Schiff, then the panel's ranking Democrat and now its chairman, and Rep. Eric Swalwel." *Id.*

65.     On July 19, 2021, the Biden Administration's Attorney General, Merrick Garland, announced a broad policy against using subpoenas, warrants or court orders to seize or obtain reporters' records: "'The Department of Justice will no longer use compulsory legal process for the purpose of obtaining information from or records of members of the news media acting within the scope of news-gathering activities,' Mr. Garland wrote to federal prosecutors in a three-page policy memo [https://int.nyt.com/data/documenttools/attorney-general-memo-re-compulsory-process/862efd19514d7250/full.pdf]. He added that the department would also revise its regulations to reflect the new limit." https://www.nytimes.com/2021/07/19/us/politics/reporter-records-justice-department.html.

66.     The Verizon Subpoena would require the production of cell phone data related to and within the scope of Harris' newsgathering activities, and would necessarily identify Harris' journalistic sources, including confidential sources, she was in contact with between November 1, 2020 to January 31, 2021.

67.     Demanding journalists' telephone records that reveal confidential sources from third parties is tantamount to demanding the records from the journalists themselves. A journalist's promise to maintain confidentiality would be meaningless if a source's identity could

be discovered without any legal challenge.  The potential exposure of confidential sources will prevent Ms. Harris from credibly promising confidentiality to future sources.  The exposure of sources could also lead to threats against her physical safety, actual attacks, and both in-person and online harassment and attempts at intimidation.

68.    The commitment to protecting journalists' newsgathering activities from disclosure is also embodied in the District of Columbia's Free Flow of Information Act, D.C. Code § 16-4701 *et seq.*, which protects both the identity of sources and unpublished information collected or prepared in the newsgathering process. Congress has also recognized the importance of journalistic privilege.  In adopting the federal Privacy Protection Act of 1980, 42 U.S.C. § 2000-aa, which restricted the search or seizure of journalists' documentary materials, a Senate Report recognized the "unique needs of the journalism profession, and the unique role that the press is accorded in our constitutional framework." S. Rep. No. 96-874, at 22 (1980). The Report announced Congress' commitment "to the principle that the government ought to employ the least intrusive, practicable means to secure information that is necessary for criminal proceedings" and made clear that Congress' intention in enacting the law was to ensure that members of the press have an opportunity to appear in court before the government may obtain materials reflecting their newsgathering process. *Id.*

69.    Therefore, the Verizon Subpoena should be quashed, and the House Select Committee enjoined from further efforts to subpoena Ms. Harris, her records from third-party sources, or to seek her testimony in this investigation.  Alternatively, the House Select Committee should be — and to ensure a vigorous, aggressive, and independent press must be — required to articulate here the reasons that the telephone records it seeks are so critical to its

investigations that its discovery demands should prevail over this Nation's longstanding commitment to protecting the independence and vitality of the press.

## COUNT I

### (Harris' Cell Phone Data is Protected by the First Amendment)

70.    Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 69 as if fully set forth herein.

71.    The D.C. Circuit recognizes a qualified First Amendment privilege in civil cases against compelled disclosure of sources and other unpublished information. *Goldberg v. Amgen, Inc.*, 123 F.Supp.3d 9 (D.D.C. 2015). "The Court of Appeals has long recognized that, in civil cases, journalists enjoy a qualified privilege against compelled disclosure of their First Amendment activities." *Goldberg,* 123 F.Supp.3d at 15, citing *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974); *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981).

72.    This qualified privilege extends to both confidential information and unpublished, nonconfidential information. *Peck v. City of Boston (In re Slack)*, 768 F. Supp. 2d 189, 194 (D.D.C. 2011).

73.    In either case, the court applies a two-prong test to determine whether the privilege is overcome: (1) the party seeking the information has exhausted all reasonable, alternative means of identifying the source; and (2) the information goes to the heart of that party's case. *See, e.g.*, *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005).

74.    Some courts apply a third factor as well, balancing the public's interest in protecting the newsgathering process against the private interest in disclosure. *Compare Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 335-36 (D.D.C. 1994), *with Lee v. Dep't of Justice*, 401 F. Supp. 2d 123 (D.D.C. 2005).

75.     During the time frame of the Verizon Subpoena, Harris was documenting Tarrio and the Proud Boys and used her phone to communicate with confidential and nonconfidential sources in support of that story.  Therefore, the telephone records sought by Defendants contain information sufficient to reveal the identities of Harris' confidential sources.

76.     The information sought by the Verizon Subpoena would also impermissibly intrude on her protected newsgathering activities, deprive her of future opportunities to obtain confidential information from confidential sources, and expose her to possible threats of bodily harm from those whose numbers would be so exposed by disclosure of her call detail records.

77.     Harris' telephone records subject to the Verizon Subpoena are therefore protected by the First Amendment of the United States Constitution, and the House Select Committee impermissibly seeks to circumvent these protections without any showing that the privilege against disclosure should be overcome.

## COUNT II

**(Harris' Cell Phone Data is Protected by the Federal Common Law Reporter's Privilege)**

78.     Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 77 as if fully set forth herein.

79.     The qualified common law reporter's privilege stems from Rule 501 of the Federal Rules of Evidence, which authorizes federal courts to develop evidentiary privileges in federal question cases. *Shoen v. Shoen*, 48 F.3d 412, 414 (9th Cir. 1995) (As we noted in *Shoen I*, all but one of the federal circuits to address the issue have interpreted *Branzburg v. Hayes*, 408 U.S. 665 (1972), as establishing a qualified privilege for journalists against compelled disclosure of information gathered in the course of their work"). Recognition of a federal common law reporter's privilege in this Circuit is supported by the fact that 49 states and the District of

Columbia recognize at least a qualified reporter's privilege; the federal courts have routinely limited discovery of sources in both civil and criminal contexts; and Justice Department guidelines for issuing subpoenas to reporters establish a federal policy of protecting newsgathering.

80.     During the time frame of the Verizon Subpoena, Harris was documenting Tarrio and the Proud Boys and used her phone to communicate with confidential and nonconfidential sources in support of that story.  Therefore, the telephone records sought by Defendants contain information sufficient to reveal the identities of Harris' confidential sources.

81.     The information sought by the Verizon Subpoena would also impermissibly intrude on her protected newsgathering activities, deprive her of future opportunities to obtain confidential information from confidential sources, and in the context of covering violent protests,[11] expose her to possible bodily harm and harassment from those whose numbers would be so exposed by disclosure of her call detail records.

82.     Harris' telephone records subject to the Verizon Subpoena are therefore protected by the reporter's privilege under federal common law, and the House Select Committee impermissibly seeks to circumvent these protections without any showing that the privilege against disclosure is overcome.

## COUNT III

### (Harris' Cell Phone Data is Protected by the Free Flow of Information Act, D.C. Code § 16-4701 *et seq.*)

83.     Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 82 as if fully set forth herein.

---

[11] *See* "D.C. Attorney General sues the Proud Boys, Oath Keepers over the Jan. 6 attack," https://www.washingtonpost.com/national-security/racine-jan-6-lawsuit/2021/12/14/4e581d00-5c51-11ec-bda6-25c1f558dd09_story.html

84.     The District of Columbia's Free Flow of Information Act, D.C. Code § 16-4701 *et seq.*, protects newsgathering materials from forced disclosure, including the identity of sources and unpublished information collected or prepared in the newsgathering process.

85.     While the protection for unpublished information is qualified under the Act, the protection for the identity of sources is absolute.  D.C. Code §§ 16-4702 and 16-4703.

86.     During the time frame of the Verizon Subpoena, Harris was a journalist acting in a news gathering and news disseminating capacity.  She was documenting Tarrio and the Proud Boys and used her phone to communicate with confidential and nonconfidential sources in support of that story.  Therefore, the telephone records sought by the House Select Committee contain information sufficient to reveal the identities of Harris' confidential sources and are absolutely protected.

87.     The information sought by the Verizon Subpoena would also impermissibly intrude on her protected newsgathering activities while acting as a journalist, and the House Select Committee impermissibly seeks to circumvent these protections without any showing that the protections against disclosure contained in the Act are overcome.

## COUNT IV

### (The Verizon Subpoena Violates the Due Process Clause of the Fifth Amendment)

88.     Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 87 as if fully set forth herein.

89.     The information sought by the Verizon Subpoena is protected by the reporter's First Amendment privilege, federal statutory and common law, and the District of Columbia's press shield law.

90.     By issuing the Verizon Subpoena directly to Verizon and requesting that records be produced just two weeks after issuance, the House Select Committee attempts to circumvent this Nation's longstanding commitment to protecting the independence and vitality of the press.

91.      In doing so, the House Select Committee essentially guaranteed that Harris would be deprived of fair notice and an opportunity to challenge the legality of the Verizon Subpoena, in violation of the Due Process clause of the Fifth Amendment.

## COUNT V

**(The Verizon Subpoena Violates the Fourth Amendment)**

92.     Plaintiff incorporates by reference and realleges the foregoing factual allegations in paragraphs 1 through 91 as if fully set forth herein.

93.     The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

94.     The fact that a third party, such as Verizon, at least temporarily stores a person's cell phone data does not alter her expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

95.     If the government, including the House Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law.  *Cf. Riley v. California*, 573 U.S. 373 (2014).  Harris has not provided her consent for Verizon to produce her cell phone data to the House Select Committee.

96.     For the House Select Committee to subpoena Verizon for *all* of Harris' personal and journalistic cell phone data over the course of almost three months is unreasonable.

97.     Such a request is so broad both temporally and with respect to the scope of the data sought, that the House Select Committee exceeds any of its lawfully authorized purposes or functions pursuant to H. Res. 503.

98.     As the subpoena in question exceeds the lawfully authorized purpose of the House Select Committee, full compliance with such subpoenas would violate Harris' Fourth Amendment protection against unlawful search and seizure. The Verizon Subpoena is thus invalid and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and provide the following relief:

(a)     A declaration that the cell phone data sought by the Verizon Subpoena is protected by the First Amendment, the federal common law reporter's privilege, and the District of Columbia's Free Flow of Information Act, D.C. Code § 16-4701 *et seq.*, and enjoining the House Select Committee from obtaining or reviewing such cell phone data;

(b)     In the alternative, a declaration that the House Select Committee may not obtain or review the telephone records of Ms. Harris until such time as this Court has had an opportunity to consider whether those records are protected against compelled disclosure, and an injunction prohibiting the House Select Committee from seeking such information concerning Ms. Harris until this Court so orders;

(c)     A declaration that the Verizon Subpoena violates the Due Process Clause of the Fifth Amendment;

(d)     A declaration that the Verizon Subpoena is overly broad and violates Ms. Harris'

Fourth Amendment right to be free from unreasonable search and seizure;

(e)     An award to Plaintiff of her reasonable costs and attorney's fees in this action;

and

(f)     Such other and further relief in favor of Plaintiff as may be just and proper.

By her attorneys,

*/s/ John D. Seiver*

Robert Corn-Revere (Bar ID: 375415)
John D. Seiver (Bar ID: 296418)
Courtney T. DeThomas (Bar ID: 888304075)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington D.C. 20005
202-973-4200
bobcornrevere@dwt.com
johnseiver@dwt.com
courtneydethomas@dwt.com

Dated: December 15, 2021.